## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

**MUSA KEITA**
3927 Itaski St.
St. Louis, MO 63116

Case No.

                 **Plaintiff,**

JURY TRIAL DEMANDED

v.

**GREEN PARK LEASING CO, LLC D/B/A GREEN
PARK SENIOR LIVING COMMUNITY**
Serve:
C T Corporation System 120 South Central Avenue
Clayton, MO 63105

**GREEN PARK MANAGEMENT CO., LLC**
Serve:
4700 Ashwood Dr. Suite 200
Cincinnati, OH 45241

**HEALTH FACILITY MANAGEMENT, LLC D/B/A
COMMUNICARE FAMILY OF COMPANIES**
Serve:
4700 Ashwood Dr. Suite 200
Cincinnati, OH 45241

                 **Defendant(s).**

---

## PLAINTIFF'S COMPLAINT FOR DAMAGES

      The Plaintiff, by and through undersigned counsel, submits this Complaint for Damages

against the above-named Defendant(s), and in further support, states and alleges as follows:


*Filing of
Steele Chaffee*

1

## PLAINTIFF

1.      Musa Keita ("Plaintiff") suffered injuries at Green Park Leasing Co, LLC d/b/a Green Park Senior Living Community, a skilled nursing facility located at 9350 Green Park Rd., St. Louis, MO 63123.   Specifically, Plaintiff suffered an avoidable pressure injury starting November 1, 2020, that required a three-month hospitalization, and debridement.

2.      Plaintiff is, and at all times relevant hereto, an adult over the age of 21 and a citizen of the state of Missouri.

## DEFENDANTS

3.      Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

## GREEN PARK LEASING CO, LLC D/B/A GREEN PARK SENIOR LIVING COMMUNITY ("GREEN PARK SENIOR LIVING")

4.      At all times relevant, Opco Festus, Mo, LLC d/b/a Festus Manor ("GREEN PARK SENIOR LIVING"), was an ohio limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as GREEN PARK SENIOR LIVING ("Facility" or "the Facility") which is a Missouri licensed nursing home located 9350 Green Park Rd., St. Louis, MO 63123.

5.      As such, GREEN PARK SENIOR LIVING was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility

 *Filing of Steele Chaffee*

2

6.      Consequently, GREEN PARK SENIOR LIVING, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at the Facility.

**GREEN PARK MANAGEMENT CO., LLC ("GREEN PARK MANAGEMENT")**

7.      At all times relevant to this action, Defendant Campbell Street Services, LLC ("GREEN PARK MANAGEMENT") was an Ohio limited liability company, authorized to do business in the State of Missouri, and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

8.      At all times relevant, GREEN PARK MANAGEMENT, and/or individuals or entities acting on its behalf, owned, operated, managed, maintained, and/or controlled – in whole or in part – the Facility.

9.      GREEN PARK MANAGEMENT, and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

     a.  Staffing budgets;

     b.  The development and implementation of nursing policies and procedures;

     c.  The hiring and firing of the administrator; and

     d.  Training and supervising nursing staff persons.

10.     These actions and business decisions had a direct impact on the care provided to all residents including Resident.

11.     GREEN PARK SENIOR LIVING and COMMUNICARE are the alter egos of GREEN PARK MANAGEMENT.



12.     Consequently, GREEN PARK MANAGEMENT owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

## HEALTH FACILITY MANAGEMENT, LLC D/B/A COMMUNICARE FAMILY OF COMPANIES ("COMMUNICARE")

13.     At all times relevant to this action, Defendant Holdco Festus, MO, LLC ("COMMUNICARE") was an Ohio limited liability company and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

14.     At all times relevant to this action, COMMUNICARE, and/or individuals or entities acting on its behalf, operated, managed, maintained, and/or controlled, in whole or in part, the Facility.

15.     COMMUNICARE, and/or individuals or entities acting on its behalf, operated, managed, maintained, and controlled the Facility by exercising final authority over:

    a.  Staffing budgets;

    b.  The development and implementation of nursing policies and procedures;

    c.  The hiring and firing of the administrator; and

    d.  Appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of the Facility.

16.     These actions and business decisions had a direct impact on the care provided to all residents including Resident.



17.    Consequently, COMMUNICARE owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at the Facility and breached said duty for all the reasons stated in this Complaint.

## DEFENDANTS' JOINT ENTERPRISE/VENTURE

18.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

19.    Defendants GREEN PARK SENIOR LIVING, GREEN PARK MANAGEMENT, and COMMUNICARE ("Joint Venture Defendants") were engaged in a joint venture in that:

    a.  The Joint Venture Defendants had an agreement, express and/or implied, among the members of the group to operate the Facility, a Missouri licensed nursing home;

    b.  The Joint Venture Defendants had had a common purpose to operate the Facility, a Missouri licensed nursing home;

    c.  The Joint Venture Defendants had a community of pecuniary interest in the operation of the Facility, a Missouri licensed nursing home; and

    d.  The Joint Venture Defendants had had an equal right to a voice in the direction of the operation of the Facility, a Missouri licensed nursing home.

20.    There has been a close relationship between the Joint Venture Defendants at all times relevant.

21.    As a consequence of the joint venture, the Joint Venture Defendants owed a joint duty to Resident to use reasonable care for their safety while under their care and supervision at the Facility.

## JURISDICTION AND VENUE

22.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:


*Filing of Steele Chaffee*

23. The sole member of each defendant is Charles Stoltz.

24. Charles Schultz is a citizen of Ohio.

25. Thus, each defendant is a citizen of the state Ohio by way of each of there sole member being citizen of the state of Ohio.

26. Therefore, Plaintiff brings his claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

27. Pursuant to RSMo § 506.500.1(3), defendants. purposefully availed themselves of the protections and/or benefits of the laws in Missouri by committing tortious acts within the state including, but not limited to, failing to ensure that the Facility had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

28. A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in this District of Missouri, thereby making venue proper in this Court.

AGENCY

29. Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:



SC *Filing of*
*Steele Chaffee*

30.     The acts hereinafter described were performed by the agents, representatives, servants, and employees of Defendants and were performed either with the full knowledge and consent of Defendants, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the Defendants.

31.     Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of Defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Resident.

## FACTUAL BACKGROUND

32.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

33.     Upon information and belief, at no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from GREEN PARK SENIOR LIVING, GREEN PARK MANAGEMENT, or COMMUNICARE, or any other staff member ever provide any sort of in-service training or clinical education to the Facility staff regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure ulcers or skin breakdown in residents like Resident.



34. Upon information and belief, at no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from GREEN PARK SENIOR LIVING, GREEN PARK MANAGEMENT, or COMMUNICARE, or any other staff member ever implement the appropriate policies and procedures at the Facility regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure ulcers in residents like Resident.

35. Upon information and belief, while Resident was a resident at the Facility, the Facility did not have an adequate amount of staff working on a daily basis at the Facility to meet Resident's needs, perform the interventions required to prevent Resident's avoidable pressure ulcer or prevent the progression of Resident's pressure ulcer, or monitor and adequately supervise Resident's condition.

## Management of the Facility

36. Most skilled nursing homes substantially derive their revenue and profits from the receipt of taxpayer dollars through the federally funded Medicare program. Under Medicare, residents with higher acuity levels, i.e., a greater number and greater degree of illnesses, place higher demands for care and services on the facility and its staff.

37. The rate at which the skilled nursing facilities accepting Medicare dollars for the delivery of nursing care and services, and according to the amount of their ultimate revenue and profits, are normally based upon the acuity level of the residents confided to their facilities. Thus, the higher overall and/or average acuity a facility has, the higher their reimbursement rates will be in general.

 *Filing of Steele Chaffee*

8

38.     For purposes of reimbursement, acuity, the amount of care a resident requires, is measured using a process established by The Center for Medicare Services ("CMS").

39.     This process includes a detailed Resident Assessment Instrument, completed by the facility for each resident as varying intervals depending on the resident's circumstance.

40.     The RAI form is known as a "MDS" (Minimum Data Set) and must be certified to CMS by a registered nurse on behalf of the facility.

41.     The MDS information provided by the facilities for each resident is processed and CMS assigns a corresponding "RUG Score" which indicates a resident's acuity and reimbursement rate.

42.     CMS correlates this RUG, or acuity, score, to an amount of time necessary to meet the needs of that resident.  Averaging the acuity scores for an entire facility, this time is then represented as Hours Per Patient Day, or HPPD.

43.     This number describes the average amount of care giving time each resident in the facility should receive to sufficiently meet their needs.  For example, if a facility has an HPPD of 2.8, that means that each resident should receive 2.8 hours of care time devoted to meeting their needs.

44.     Just as there is a relationship between the RUG scores HPPD, there is also a relationship between RUG scores and reimbursement rates.

45.     The RUG score, the HPPD and the Reimbursement Rates are all based upon the same information provided by the facilities, and the reimbursement rate is directly related to the amount of time a facility should spend caring for that resident.



*Filing of*
*Steele Chaffee*

9

46.     Therefore, the amount of money a facility receives is based upon the amount of time the facility should spend caring for that resident, all based upon the assessment information the facility certifies as accurate to CMS.

47.     Acuity levels are reflected in the resident's "Resource Utilization Group" classification or "RUGs".  RUGs are mutually exclusive categories that reflect the amount of resources that will be needed in order to meet the needs of a particular resident in a skilled nursing facility.  They are assigned to residents based on data derived from an assessment tool referred to as a "Minimum Data Set" ("MDS").

48.     Based on this MDS, each resident's individual care needs (also called "acuity level") are assigned into a group signifying how much nursing or staff care the resident requires, called a Resource Utilization Group score, or "RUG" score.

49.     A completed MDS contains extensive information on a resident's nursing needs, activities of daily living impairments, cognitive status, behavioral problems, and medical diagnoses.  This information is used to slot the resident into a RUG.

50.     RUGs are organized in a hierarchy from residents who will need the greatest amount of resources to residents who will need the least amount of resources during their stay at the nursing facility.  Residents with more specialized nursing requirements, licensed therapies, greater activities of daily living dependency, or other conditions will be assigned to higher groups in the RUG hierarchy.



51.     MDS's are required to be prepared for each resident of a skilled nursing facility when they initially arrive at the facility and periodically after that depending on the course of the resident's medical progression.  At a minimum, an MDS is to be prepared for every resident in a skilled nursing facility on a quarterly basis.

52.     The completion of an MDS by a skilled nursing facility is a part of the federally mandated process for clinical assessments of all residents in nursing facilities.  It is a core set of screening, clinical, and functional status elements reported on all residents of nursing facilities regardless of who is paying for the resident's stay in the nursing facility.

53.     MDS's need to be as detailed and comprehensive as possible so that they reflect all of the needs of each of the residents in the nursing facility.

54.     When done properly, the MDS provides a comprehensive assessment of each resident's functional capabilities and helps nursing facility staff identify all of the health problems of each of their residents.

55.     Each resident's RUG score is contained in section Z of their MDS evaluation, meaning the total care needs of the residents in any facility at a specific time is available by totaling the residents' RUG scores from their MDS evaluations.

56.     The RUG Score also determines the level of compensation a skilled nursing facility will receive in order to provide the level of care necessary for each of their residents.

57.     Residents in higher RUG categories place higher demands for care and services on the nursing facility and its staff.



58.     Providing care to residents in higher RUG categories is costlier and is, therefore, reimbursed at a higher level.

### Levels of Necessary Care & Expected Staffing

59.     CMS is the federal agency that is tasked with regulating all nursing facilities in this country.  Through the years, CMS has sponsored multiple studies to determine the amount of time that RNs, LPNs, and CNAs in nursing facility spent caring for residents as well as other elements of resident care.

60.     Medicare has commissioned and made available to every nursing home studies and data showing the number of minutes of nursing and nursing aide care a person at a specific RUG level should be expected to require, which Medicare calls "expected staffing."

61.     Because of these studies, CMS is able to set a number of hours of direct care that they expect to be provided to residents by RNs, LPNs, and CNAs based on the nursing facility's total acuity level.

62.     This expectation is expressed in terms of "hours per patient day" or "HPPD".

63.     With the information gleaned from the MDSs that are provided to CMS by each skilled nursing facility, CMS is able to determine an HPPD that is expected for each nursing facility in the country.  This is referred to as the "expected HPPD" or simply "expected staffing."

64.     When these RUG scores are combined for all residents in a skilled nursing facility, the nursing home knows exactly how many minutes of nursing and nursing aide care should be provided, on average, to meet the expected care needs of their residents.



65.     The only way to determine the total acuity level and corresponding RUG of each of the residents at a facility such as the Facility on any given day is by examining section Z of every MDS in effect on that day.

66.     It is only this empirical data from the MDS Part Z that is necessary to determine the acuity for any particular resident, and thus determine the staffing for a facility.

67.     It is not necessary to disclose or review any residents' information and the relevant information contained in Section Z of the residents' MDS forms can easily be redacted to prevent unnecessary disclosure of HIPPA protected health information.

### Cost Reporting & Staffing Information

68.     Nursing facilities, like the Facility, are required to submit an annual "Cost Report" to CMS, known as "CMS Form 2540-10".  The cost report is a financial report that identifies the cost and charges related to healthcare treatment activities in a particular nursing facility.

69.     Included with the cost reports are extensive details as to how much money the nursing facility spent on RNs, LPNs, and CNAs.  The cost reports reflect the patient census, hours paid, and the hourly rate that the nursing facility paid each category of direct caregivers.

70.     By dividing the paid hours by the patient census in the facility it is possible to determine how many hours the nursing facility paid for each category of direct caregivers per resident per day for the time period covered by that particular cost report.  This number is referred to as the "reported HPPD".



*Filing of*
*Steele Chaffee*

71.     CMS allows the facilities to include all paid hours in the "reported HPPD."  Thus, that number does actually reflect true direct care hours, but is inflated due to the fact that "hours paid" includes sick pay and vacation pay both of which reduce the amount of actual HPPD provided by caregivers to residents in nursing facilities.

72.     The Facility was also required to report quarterly staffing information through the CMS "Payroll Based Journal" (PBJ) program.

73.     To determine more accurate direct-care hours, it is necessary to examine the data that nursing facilities use to track the number of hours their employees work.  This information is easily accessed through reports that are commonly referred to as "Time Detail Reports", "Punch Detail Data Reports", or some other similarly named report depending on the time-keeping system used by the particular nursing facility.

74.     The more detailed Punch Detail or time records will note vacation or sick time paid and thus, reveal actual hours worked in the facility.  This information reveals a more accurate direct care number and allows the calculation of the actual HPPD for any period of time including a year, a quarter, a month, or a day.

75.     Upon information and belief, the staffing levels reported by the Facility skilled nursing & therapy for the time period Resident was at the Facility were below the CMS expected levels derived from the MDS RUG rates which reflect actual acuity and not simply a resident census.



76.     Upon information and belief, the staffing levels reported by the Facility skilled nursing & therapy for the time period Resident was at the Facility were below the CMS expected levels derived from the MDS RUG rates which reflect actual acuity and not simply a resident census.

### Undercapitalization/Underfunding at the Facility

77.     COMMUNICARE, GREEN PARK MANAGEMENT, and GREEN PARK SENIOR LIVING had a duty to provide financial resources and support to the Facility in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

78.     COMMUNICARE, GREEN PARK MANAGEMENT, and GREEN PARK SENIOR LIVING had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

79.     Upon information and belief, GREEN PARK SENIOR LIVING had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

80.     Upon information and belief, no individuals at the Facility are involved in decision making about the financial operations or what its resources were and where they would be spent.

81.     Transactions directed by GREEN PARK MANAGEMENT and COMMUNICARE left the Facility with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their facility during Resident's time there



## LEGAL BASIS FOR GREEN PARK MANAGEMENT AND COMMUNICARE'S LIABILITY

### Joint Venture/Enterprise

82.     GREEN PARK MANAGEMENT and COMMUNICARE are collectively referred to herein as the "Corporate Defendants."

83.     The Corporate Defendants directed, operated and managed the day-to-day functions of their nursing facilities – including the Facility – by developing and implementing policies, practices and procedures affecting all facets of the Facility, including resident care.

84.     These policies manipulate and control the physical and financial resources, and prohibit decision making at the Facility level.

85.     This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents.

86.     These policies and practices were developed and implemented without regard to the needs of the residents and, in fact, mandated the reckless disregard for the health and safety of the Facility's residents.

87.     The Corporate Defendants affirmatively chose and decided to establish such operations and demand they be implemented.



*Filing of*
*Steele Chaffee*

88.     Upon information and belief, such operations included, *inter alia*, the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff the Facility and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of the facility's staff.

89.     The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

90.     The Corporate Defendants, conduct themselves in a manner which indicates a joint venture/enterprise amongst them, to wit:

    a.   The shared interest in the operation and management of nursing facilities;

    b.   The express and implied agreements amongst them to share in the profits and losses of such venture/enterprise; and

    c.   The obvious actions taken showing the cooperation in furthering the venture/enterprise operating and managing nursing facilities.



*Filing of*
*Steele Chaffee*

91.     Missouri law recognizes a joint venture/enterprise where the parties alleged to be partners in such venture/enterprise share a common interest in the property or activity or the joint venture; maintain agreements, either express or implied, to share in profits or losses of the venture/enterprise; and express actions or conduct showing cooperation in the project of the venture/enterprise.

92.     The Corporate Defendants share a common interest in the operation and management of nursing facilities, including the Facility; maintain agreements to share in the profits or losses of the operation of nursing facilities described herein; and operate on a daily basis evincing conduct which indicates their cooperation in the venture of operating and managing nursing facilities for profit.

93.     The Corporate Defendants and GREEN PARK SENIOR LIVING took direct, overt and specific actions to further the interest of the joint enterprise.

94.     These actions were taken through a joint venture/enterprise or through the Corporate Defendants and GREEN PARK SENIOR LIVING's officers, directors, managers and or employees.

95.     The Corporate Defendants had an equal right to share in the profits and to bear liability for, the joint venture/enterprise.

96.     Further, because the Corporate Defendants and GREEN PARK SENIOR LIVING were dominated by each other, these entities had an equal right to direct or control their venture as a whole, as well as to direct or control the operation and management of the Facility.



## Direct Participation/Individual Actions

97.     The Corporate Defendants were at all times material to this lawsuit in the business of managing, owning and operating a network of nursing homes throughout the State of Missouri. One such nursing home was the Facility where Resident was admitted for care and treatment.

98.     At all times material to this lawsuit, the Corporate Defendants were fully aware that the delivery of essential care services in each of their nursing homes – including the Facility – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the nursing home; and, (3) payor mix.

99.     At all times material, the Corporate Defendants made critical operational decisions and choices which manipulated and directly impacted the Facility's revenues and expenditures. More particularly, the Corporate Defendants determined:

      a.   The number of staff allowed to work in their chains of nursing homes including the Facility;

      b.   The expenditures for staffing at the nursing homes including the Facility;

      c.   The revenue targets for each nursing home including the Facility;

      d.   The payor mix, and, census targets for each nursing home including the Facility;

      e.   Patient recruitment programs and discharge practices at each nursing home including the Facility.

100.    All cash management functions, revenues and expenditure decisions at the nursing home level – including the Facility – were tightly managed, directed, and supervised by the Corporate Defendants.

 *Filing of*
*Steele Chaffee*

101.     It was the choices made by the Corporate Defendants which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including the Facility.

102.     The Corporate Defendants formulated, established and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

103.     The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by the Corporate Defendants were implemented and such application was carefully supervised and enforced.

104.     Following the mandates, the Facility functioned in accordance within them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as the Corporate Defendants deemed appropriate.

105.     Accordingly, such manipulation by the Corporate Defendants as to staffing and census were motivated by the financial needs of the Corporate Defendants and the Facility as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

106.     Instead of abiding by their duty to care for the residents, the Corporate Defendants chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.



107.     The Corporate Defendants, therefore, directly participated in a continuing course of negligent conduct, requiring the Facility to recruit and retain heavier care, higher pay residents to the Facility even though the needs of the patient population far exceeded the capacity of staff.

108.     At the same time, the Corporate Defendants chose to design, create, implement and enforce operational budgets at the Facility which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

109.     In so doing, the Corporate Defendants disregarded, superseded, and violated the duties and responsibilities imposed on a licensed nursing home, in this case the Facility, by the State of Missouri, and the federal government.

Corporate Malfeasance

110.     The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

111.     Accordingly, the Corporate Defendants, by their operational choices and decision making, and in order to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

112.      These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Missouri and federal government imposed upon the Corporate Defendants and the Facility.



113.     Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at the Facility including Resident, failed to receive even the most basic care required to prevent catastrophic injury.  This negligence and resulting injuries ultimately led to and caused Resident's injuries as described above.

114.     During Resident's residency at the Facility, Resident sustained physical injuries and died, as described in more detail above, as a result of the acts, omissions, decisions and choices made by the Corporate Defendants in operating the Facility.

115.     During Resident's residency at the Facility, the Corporate Defendants negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe and protective environment, and that, as a result of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above.  Ultimately, Resident died as a result of this failure.

116.     The Corporate Defendants manage, operate and direct the day-to-day operations of the Facility and these Corporate Defendants are liable for this direct involvement in the operations of such Facility. These Corporate Defendants are therefore liable to the Plaintiff for the neglect of and injuries to Resident.

117.     The Facility and these Corporate Defendants have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:



a.   Chosen to disregard the duties and responsibilities which the Facility, as a licensed nursing home, owed to the State of Missouri and its residents;

b.   Created the dangerous conditions described by interfering with and causing the Facility to violate Missouri statutes, laws and minimum regulations governing the operation of said nursing home;

c.   Superseding the statutory rights and duties owed to nursing home residents by designing and mandating dangerous directives, policies, management and day to day operation of the Facility;

d.   Caused the harm complained of herein; and

e.   Choosing to disregard the contractual obligations owed to the State of Missouri and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

### COUNT I - (Negligence v. All Defendants)

118.   Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

119.   At all times material hereto Resident was in a defenseless and dependent condition.

120.   As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care and treatment.

121.   At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

122.   At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing facility.



123.     These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

124.     These duties required Defendants to have sufficient and qualified staff at the Facility nursing home to ensure the proper care for, and treatment of all residents including Resident.

125.     These duties required Defendants to ensure that the Facility' nurses and other staff were properly educated and trained with regard to the care for, and treatment of all residents including Resident.

126.     These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

127.     Specifically, during the course of their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

     a.  Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition as well as Resident's skin condition;

     b.  Failing to adequately assess Resident's risk of developing skin breakdown and pressure ulcers;

     c.  Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition;

     d.  Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision;



e.   Failing to have a sufficient number of staff at the Facility to ensure Resident's needs were being met with regard to skin care and pressure ulcer prevention;

f.   Failing to provide adequate assistive devices and interventions to prevent Resident's skin breakdown and pressure ulcers;

g.   Failing to enact and carry out an adequate Care Plan in regard to Resident's increased risk for skin breakdown and pressure ulcers;

h.   Failing to provide adequate preventative skin care to Resident;

i.   Failing to provide adequate assistance and assistive devices to prevent Resident's skin breakdown and pressure ulcers;

j.   Failing to appropriately assess and maintain clean and dry skin where Resident developed a pressure ulcer;

k.   Failing to turn and reposition Resident every two (2) hours;

l.   Failing to utilize proper procedures for scheduling of turning and repositioning;

m.  Failing to adequately assess, monitor, ensure, and document the administration of adequate nutrition and hydration to Resident;

n.   Failing to adequately and concisely document the measurement of Resident's wounds for proper and efficient wound treatment, management, and progression;

o.   Failing to prevent the development and worsening of Resident's pressure ulcers;

p.   Failing to timely report Resident's changes in condition to a physician;

q.   Failing to carry out the instructions of Resident's physician;

r.   Failing to adequately, timely and consistently prevent, assess, and treat Resident's pressure ulcer;

s.   Failing to timely transfer Resident to a Facility that could provide adequate care;

t.   Failing to properly supervise and train the employees, agents and/or servants of the Defendants who were responsible for the care and treatment of Resident;

u.   Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of pressures ulcers in residents like Resident;

v.   Failing to carry out and follow standing orders, instructions and protocol regarding the prevention of Resident's skin breakdown and pressure ulcers;

w.   Failing to ensure the nursing home was properly capitalized.


*Filing of*
*Steele Chaffee*

x.   Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiff, but which is verily believed and alleged will be disclosed upon proper discovery procedures in the course of this litigation.

128.   Defendants, as the owners, operators, and/or managers of skilled care nursing facilities licensed by the State of Missouri and accepting Medicare and Medicaid funds, were subject to regulations promulgated by the Missouri Division of Social Services and under the Social Security Act.

129.   While providing care and treatment to Resident, Defendants and their agents, servants and/or employees breached their duty to Resident and were guilty of acts of negligence and negligence, *per se*, in violating regulations governing residential care facilities including but not limited to the following:

a.   19 C.S.R. 30-85.042(3). The operator shall be responsible to assure compliance with all applicable laws and rules.  The administrator shall be fully authorized and empowered to make decisions regarding the operation of the Facility and shall be held responsible for the actions of all employees. The administrator's responsibilities shall include the oversight of residents to assure that they receive appropriate nursing and medical care;

b.   19 C.S.R. 30-85.042(6).  the Facility shall not knowingly admit or continue to care for residents whose needs cannot be met by the Facility directly or in cooperation with outside resources. Facilities which retain residents needing skilled nursing care shall provide licensed nurses for these procedures;

c.   19 C.S.R. 30-85.042(13).  the Facility shall develop policies and procedures applicable to its operation to insure the residents' health and safety and to meet the residents' needs.  At a minimum there shall be policies covering personnel practices, admission, discharge, payment, medical emergency treatment procedures, nursing practices, pharmaceutical services, social services, activities, dietary, housekeeping, infection control, disaster and accident prevention, residents' rights and handling residents' property;

d.   19 C.S.R. 30-85.042(15).  All personnel shall be fully informed of the policies of the Facility and of their duties;



e.  19 C.S.R. 30-85-14.042(16). All persons who have any contact with the residents in the Facility shall not knowingly act or omit any duty in a manner which would materially and adversely affect the health, safety, welfare or property of a resident;

f.  19 C.S.R. 30-85.042(22).  the Facility must ensure there is a system of in-service training for nursing personnel which identifies training needs related to problems, needs, care of residents dehydration, total kidney failure, and infection control and is sufficient to ensure staff's continuing competency;

g.  19 C.S.R. 30-85.042(37).  All facilities shall employ nursing personnel in sufficient numbers and with sufficient qualifications to provide nursing and related services which enable each resident to attain or maintain the highest practicable level of physical, mental and psychosocial well-being.  Each facility shall have a licensed nurse in charge who is responsible for evaluating the needs of the residents on a daily and continuous basis to ensure there are sufficient trained staff present to meet those needs;

h.  19 C.S.R. 30-85.14.042(66). Each resident shall receive twenty four (24)-hour protective oversight and supervision;

i.  19 C.S.R. 15-14.042(67).  Each resident shall receive personal attention and nursing care in accordance with his/her condition and consistent with current acceptable nursing practice;

j.  19 C.S.R. 15-14.042 (70) Residents who are physically or mentally incapable, or both, of changing their own positions shall have their positions changed at least every two (2) hours and shall be provided supportive devices to maintain good body alignment.

k.  19 C.S.R. 30-85.042(79). In the event of accident, injury or significant change in the resident's condition, facility staff shall notify the resident's physician in accordance with the Facility's emergency treatment policies which have been approved by the supervising physician;

l.  19 C.S.R. 30-85.042(80). In the event of accident, injury or significant change in the resident's conditions, facility staff shall immediately notify the person designated in the resident's record as the designee or responsible party; and

m.  19 C.S.R. 30-85.042(81). Staff shall inform the administrator of accidents, injuries or unusual occurrences which adversely affect, or could adversely affect the resident. the Facility shall develop and implement responsive plans of action.

130.    Resident was a member of the class of persons intended to be protected by the enactment of the aforementioned regulations.



131.    The physical injuries Resident incurred were the type of injuries that the regulations were enacted to prevent.

132.    As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered damages, including but not limited to medical bills and expenses, pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; and other damages.

133.    The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for punitive damages for their grossly negligent care of Resident.

134.    At the time defendants caused and allowed Resident to develop an avoidable pressure injury and permit the injury to become infected, they knew that their conscious disregard to provide adequate staff and properly capitalize Facility created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.

135.    Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.



136.     As a direct and proximate result of defendant's acts resulting in an understaffed and undercapitalized nursing home, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; and other damages

WHEREFORE, Plaintiff, prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages and punitive damages, the costs of this action, and for such other and further relief as the Court deems just and proper.

### COUNT II - (Alter Ego v. Defendants GREEN PARK MANAGEMENT, COMMUNICARE)

137.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

138.     For the purposes of this Count Defendants GREEN PARK MANAGEMENT and COMMUNICARE are hereinafter referred to as the "Alter Ego Defendants".

139.     GREEN PARK SENIOR LIVING ("Subsidiaries") are so dominated by the Alter Ego Defendants that the Subsidiaries are a mere instrument of the Alter Ego Defendants and are indistinct from the Alter Ego Defendants.

140.     In fact, the Subsidiary is controlled and influenced by the Alter Ego Defendants in that the Alter Ego Defendants exercised complete control and domination over the Subsidiaries finances and business practices.



141.    Specifically, the Alter Ego Defendants' complete control and domination over the Subsidiaries caused the Facility's undercapitalization and understaffing while Resident was at the Facility.

142.    Upon information and belief, the Alter Ego Defendants' complete control and domination over the Subsidiaries caused the Subsidiaries to operate at a loss during the years of 2019 and 2020.

143.    Upon information and belief, the Alter Ego Defendants' complete control and domination over the Subsidiaries caused the Subsidiary's liabilities to exceed its assets by during the years 2019 and 2020.  Specifically:

   a.   The Alter Ego Defendants own all or most of the capital stock of the Subsidiaries;

   b.   The Alter Ego Defendants and the Subsidiaries have common directors or officers;

   c.   The Alter Ego Defendants finance the Subsidiaries;

   d.   The Alter Ego Defendants subscribe to all of the capital stock of the Subsidiaries;

   e.   The Alter Ego Defendants caused the incorporation of the Subsidiaries;

   f.   The Facility has grossly inadequate capital;

   g.   The Alter Ego Defendants pay the salaries and other expenses or losses of the Subsidiaries;

   h.   The Alter Ego Defendants use the property of the Subsidiaries as its own; and

   i.   The directors or executives of the Subsidiaries do not act independently in the interest of the Subsidiaries but take their orders from the Alter Ego Defendants in the latter's interest.



144.    Thus, the Alter Ego Defendants used the corporate cloak of the Subsidiaries as a subterfuge to defeat public convenience, to justify a wrong, and/or to perpetrate a fraud in that the Alter Ego Defendants' complete control and domination of the Subsidiaries depleted all of the Subsidiary's assets, thereby making it unable to pay a judgment resulting from its care of residents including Resident.

145.    This undercapitalization and understaffing violated GREEN PARK SENIOR LIVING's duties under 19 C.S.R. § 30-85.042 and the applicable standard of care owed by a nursing home operator or manager to the Facility's residents.

146.    As a direct and proximate result of the individual and collective acts of negligence of the Subsidiaries – and the Alter Ego Defendants – Resident was harmed and suffered damages, including but not limited to medical bills and expenses, pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life, and other damages.

147.    The actions of the Alter Ego Defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for punitive damages for their grossly negligent care of Resident.

148.    At the time Alter Ego Defendants caused and allowed Resident to develop an avoidable pressure injury and permit the injury to become infected, they knew that their conscious disregard to provide adequate staff and properly capitalize Facility created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.


SC  *Filing of*
    *Steele Chaffee*

149.    Accordingly, Alter Ego Defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

150.    As a direct and proximate result of Alter Ego Defendants acts resulting in an understaffed and undercapitalized nursing home, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; and other damages

WHEREFORE, Plaintiff, prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages and punitive damages, the costs of this action, and for such other and further relief as the Court deems just and proper.

### COUNT III- (Agency Liability v. Defendants GREEN PARK MANAGEMENT, COMMUNICARE)

151.    Plaintiff incorporates by reference all of the foregoing allegations in this Complaint as though fully set forth herein.

152.    For the Purposes of this Count, Defendants GREEN PARK MANAGEMENT and COMMUNICARE are hereinafter referred to as the "Agency Defendants."

153.    The Facility held the power to alter the legal relations between the Agency Defendants and third parties.



154.    The Facility is a fiduciary with respect to the matters within the scope of the agency – in this case the operation of the nursing home.

155.    The Agency Defendants had the right to control the conduct of the Facility with respect to matters entrusted to the Facility.

156.    Specifically, the Agency Defendants possessed the right to ensure that the Facility, had appropriate policies and procedures for its nursing staff; was properly capitalized, funded, staffed; and that staff received adequate training and supervision while Resident was at the Facility.

157.    Consequently, the Agency Defendants along with the Facility owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at the Facility.

158.    The Agency Defendants are liable because the Facility breached its duties by failing to ensure the Facility had appropriate policies and procedures for its nursing staff; was properly capitalized, funded, staffed; and that staff received adequate training and supervision while Resident was a resident at the Facility.

159.    As a direct and proximate result of the individual and collective acts of negligence of the Agency Defendants – Resident was harmed and suffered damages, including but not limited to medical bills and expenses, pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; and other damages.



Filing of
Steele Chaffee

160.     The actions of Agency Defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, Agency Defendants are liable for punitive damages for their grossly negligent care of Resident.

161.     At the time Agency Defendants caused and allowed Resident to develop an avoidable pressure injury and permit the injury to become infected, they knew that their conscious disregard to provide adequate staff and properly capitalize Facility created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.

162.     Accordingly, Agency Defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against Agency Defendants in an amount that is fair and reasonable and will punish Agency Defendants and deter them and others from similar conduct.

163.     As a direct and proximate result of Agency Defendants' acts resulting in an understaffed and undercapitalized nursing home, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; and other damages.

WHEREFORE, Plaintiff, prays for judgment against Agency Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages and punitive damages, the costs of this action, and for such other and further relief as the Court deems just and proper.

### COUNT III - (Corporate Negligence v. GREEN PARK SENIOR LIVING, GREEN PARK MANAGEMENT, COMMUNICARE)

164.    Plaintiff incorporates by reference all of the foregoing allegations in this Complaint as though fully set forth herein.

165.    For the purposes of this Count, Defendants GREEN PARK SENIOR LIVING, GREEN PARK MANAGEMENT, and COMMUNICARE are hereinafter referred to as the "Corporate Defendants."

166.    Plaintiff pursues this claim for Corporate Negligence pursuant to *LeBlanc v. Research Belton Hosp.*, 278 S.W. 3d 201 (Mo. App. W.D 2008).

167.    At all relevant times, the Corporate Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing facility.

168.    These duties required the Corporate Defendants to ensure that the Facility had sufficient and qualified staff at the Facility to ensure the proper care for, and treatment of all residents including Resident.

169.    These duties also required the Corporate Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

 *Filing of Steele Chaffee*

170.    As described above, the Corporate Defendants, failed to ensure the Facility had a sufficient number of staff and capital during the year of this incident as described above and the two years before the incident described above.

171.    As a direct and proximate result of the Corporate Defendants' acts resulting in an understaffed and undercapitalized nursing home while Resident was at the Facility, Resident was harmed and suffered damages, including but not limited to medical bills and expenses, pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; and other damages.

172.    The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for punitive damages for their grossly negligent care of Resident.

173.    At the time defendants caused and allowed Resident to develop an avoidable pressure injury and permit the injury to become infected, they knew that their conscious disregard to provide adequate staff and properly capitalize Facility created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.



174. Accordingly, Corporate Defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against Corporate Defendants in an amount that is fair and reasonable and will punish Corporate Defendants and deter them and others from similar conduct.

175. As a direct and proximate result of Corporate Defendants' acts resulting in an understaffed and undercapitalized nursing home, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; and other damages

176. WHEREFORE, Plaintiff, prays for judgment against Corporate Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages and punitive damages, the costs of this action, and for such other and further relief as the Court deems just and proper

WHEREFORE, Plaintiff, prays for judgment against the Corporate Defendants in an amount in excess of $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages, the costs of this action, and for such other and further relief as the Court deems just and proper under the circumstances.

<u>**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**</u>


*Filing of
Steele Chaffee*

Respectfully Submitted,

STEELE CHAFFEE, LLC

By:   */s/ Jonathan Steele*

Jonathan Steele  MO #63266
Kevin Chaffee    MO #63462
2345 Grand Boulevard, Suite 750
Kansas City, MO 64108
Ph: (816) 466-5947
Fax: (913) 416-9425
jonathan@nursinghomeabuselaw.com
kevin@nursinghomeabuselaw.com

ATTORNEYS FOR PLAINTIFF


*Filing of*
*Steele Chaffee*